IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PLAINTIFF, INC., an Illinois
corporation,

   Plaintiff,

  v.

PAWEL Y. SLESINSKI, NATIONAL
COMPLIANCE CENTER LLC, an
Illinois limited liability company, and
DOROTA SLESINSKI a/k/a/ DOROTA
DOBOSZ,

   Defendants.

No. 23-cv-03878

Judge Franklin U. Valderrama

**ORDER**

Plaintiff Inc. (Plaintiff), a compliance agent and business consultant in the trucking and motor carrier business, in a move it would eventually regret, hired Defendant Pawel Slesinski (Slesinski). R. 1,[1] Compl. ¶ 10. *Id.* ¶ 25. After 18 months, Slesinski ended his employment, stating he was dissatisfied with his position and was returning to his prior employer. *Id.* ¶ 28. That, however, was a ruse. Slesinski did not return to his former employer—instead, he and his wife, Dorota Dobosz (Dobosz) formed the National Compliance Center (NCC), a direct competitor to Plaintiff, while Slesinski was still in Plaintiff's employ. Compl. ¶ 34. And that's not all, as Slesinski, while still working for Plaintiff, sent himself 100 emails containing

---

[1]Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation.

proprietary information to which "only a very few authorized upper management personnel had authorized access . . . ." *Id.* ¶¶ 35, 37.

Plaintiff sued Slesinski, NCC, and Dobosz (collectively, Defendants) alleging, among other things, violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836, the Illinois Trade Secrets Act, 765 ILCS 1065 and several state law claims.[2] *See* Compl.

Defendants move to dismiss (the Motion) Plaintiff's complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). R. 17, Mot. Dismiss. For the reasons set forth below, the Court grants in part and denies in part the Motion.

## Background[3]

Plaintiff serves the trucking and motor carrier industry throughout the United States, Canada and Mexico, handling all aspects of regulations promulgated by the United States Department of Transportation (DOT) and the Federal Motor Carrier Safety Administration (FMSCA). Compl. ¶¶ 10, 11. Specifically, "[Plaintiff's] business is to assess and determine its clients' individual compliance scenarios, inform its clients which regulations apply (and don't apply) to their companies, notify its clients of impending compliance deadlines, and provide the regulation codes and a link to the official DOT mandate so that its clients can review the applicable information from the actual source." *Id.* ¶ 11.

## I.     Plaintiff's Confidential Information

To best serve its clients, Plaintiff "created a large proprietary database of

---

[2]Plaintiff has voluntarily dismissed its claim for conversion (Count VI). R. 21, Resp. at 14 n.3.

[3]The Court accepts as true all of the well-pleaded facts in the complaint and draws all reasonable inferences in favor of Plaintiff. *Platt v. Brown*, 872 F.3d 848, 851 (7th Cir. 2017).

contacts or leads using the DOT public database" as a source. Compl. ¶ 13. Plaintiff supplemented its database "by obtaining information that was not readily available, including but not limited to the current email addresses and point of contact for the safety department for all registered DOT motor carriers, testable phone numbers . . . names of parties responsible for safety compliance, and permission to be contacted by [Plaintiff], which is not authorized or granted by the DOT." *Id*. ¶ 14. This database is "contained in a single, password protected file that is only accessible to a very small number of authorized [Plaintiff] employees." *Id*. ¶ 15.

Plaintiff also created a series of unique proprietary templates and a unique system for processing payments. Plaintiff's proprietary templates consisted of "simplified, user-friendly forms" that "inform[ed] clients of regulations that they are required to comply with," "educat[ed] motor carriers about applicable DOT and FMSCA regulations," and confirmed "filing, status, and error reporting." Compl. ¶ 16. Plaintiff's system for processing payments consists of "online applications" that "collect[] data," "assess client data to alert users to additional compliance requirements," and sen[ds] users "automated confirmation alerts, receipts, and reminders based on company information and the need to comply with specific regulations." *Id*. ¶ 17.

Plaintiff "spent years and hundreds of thousands of dollars developing its aforementioned database and systems" through "assessing and correlating huge amounts of data using proprietary, confidential and trade secret technology and algorithms developed by [Plaintiff.]" Compl. ¶ 18–19.

3

## II.     Plaintiff's Efforts to Maintain Confidentiality

Plaintiff's "highly confidential, proprietary information . . .  appears in no directory or publicly available source and is neither commonly known nor easily discoverable by Plaintiff's competitors." Compl. ¶ 21. Plaintiff takes "great efforts" to maintain the secrecy of this information. *Id.* ¶ 20. It requires "all office personnel with access to confidential information . . . to sign an Information Security Trade Secrets Agreement, which prohibits the sharing of information outside of Plaintiff, except in limited circumstances;" maintains its confidential information "in protected computer files that are accessible only by use of secret passwords and two-factor authentication procedures, as well as by utilizing different levels of permission to access its files and folders;" and provides "extensive training . . . related to the avoidance of self-dealing and breaches of loyalty, including the misuse of confidential information." *Id.* ¶¶ 20, 21, 32.

## III.    Slesinski's Employment and Subsequent Conduct

Plaintiff hired Slesinski in May 2019 to work in its call center, and he eventually moved on to processing certain filings and the creation of outbound advertising mailers sent to clients or potential leads. Compl. ¶ 24–25. Four months later, Plaintiff asked, and Slesinski agreed, to sign Plaintiff's "Information Security and Trade Secrets Agreement," as he "did not have authorized access to all of Plaintiff's databases containing its proprietary information relating to leads and contacts, which were password protected, and he was not knowingly provided access to such passwords." *Id.* ¶¶ 26, 30. The Agreement required Slesinski to maintain the

confidentiality of "client information" and prohibited him from sharing the information with anyone outside of Plaintiff, except in certain authorized situations. *Id.* ¶ 31. Plaintiff also required Slesinski to receive "extensive training" in which he "agreed to abide by the policies, procedures and controls Hoffenmer had in place to protect its proprietary information and trade secrets." *Id.* ¶ 32. However, one day, Plaintiff's managers observed—despite Slesinski's best efforts at concealment—an open database file on Slesinski's desktop that he was not authorized to access. *Id.* ¶ 27. Plaintiff reprimanded Slesinski and instructed him to refrain from accessing the database in the future. *Id.*

In November 2020, Slesinski ended his employment with Plaintiff and informed management that he had decided to return to his prior employer, who was not a competitor of Plaintiff. Compl. ¶ 28. This statement, however, turned out to be false. In February 2021, a client informed Plaintiff that it had been contacted by a company called the National Compliance Center (NCC), concerning his DOT renewal, which Slesinski had previously handled. *Id.* ¶ 33. Plaintiff then investigated NCC and learned that NCC was a direct competitor formed by Slesinski's wife, Dobosz, in August 2020, while Slesinski was still working at Plaintiff. *Id.* ¶ 34. And NCC was not only a direct competitor but a plagiarist as well, as Plaintiff "discovered that NCC's website was almost identical to [Plaintiff's] website, as were the templates and forms NCC was using to service its customers, which had been created by [Plaintiff] at a great expenditure of time and money." *Id.* ¶ 35.

Ultimately, Plaintiff's investigation determined that "Slesinski had sent

5

himself over 100 emails from his [] desktop computer to his private email account while he was still employed by [Plaintiff]." Compl. ¶ 36. Several of these emails contained confidential information including:

> [Plaintiff] tutorials and scripts that were outside the scope of his work; sensitive and confidential client information such as social security numbers, employment identification numbers, dates of birth, and driver's license numbers; and [Plaintiff] credentials, including passwords and its Secret API Key (a secret token/password that is only permitted to be used by a select few authorized employees to dispatch communications to certain clients and/or leads, which Slesinski was never provided and never authorized to access or use).

*Id.* ¶ 37. Plaintiff states that "only a very few authorized upper management personnel had authorized access" to this information, alleging that Slesinski unlawfully "gave himself unauthorized access to [Plaintiff's] proprietary customer communication systems, including source codes for [Plaintiff's] proprietary program for communicating with its clients and the passwords for accessing [Plaintiff's] confidential list of customers and leads." *Id.* Plaintiff further alleges that, due to Defendants' conduct, it has "sustained substantial lost revenue and profits and is vulnerable to future losses in the conduct of its business." *Id.* ¶ 39.

Plaintiff sued Defendants, asserting claims for: breach of fiduciary duty (Count I); violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836 (DTSA) (Count II), the Computer Fraud and Abuse Act 18 U.S.C. § 1030 (CFAA) (Count III), the Stored Communications Act, 18 U.S.C. § 2701 (SCA) (Count IV), the Illinois Trade Secrets Act, 765 ILCS 1065 (ITSA) (Count V); tortious interference with business relations (Count VII); aiding and abetting breach of fiduciary duty (Count VIII); and accounting (Count IX). *See* Compl.

Defendants now move to dismiss Plaintiff's complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The fully briefed motion is before the Court.

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint. *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Under Federal Rule of Civil Procedure 8, a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss, a complaint need only contain factual allegations, accepted as true, sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

## Analysis

Defendants argue that each of Plaintiff's nine counts should be dismissed. The Court addresses each in turn.

## I.     Violations of the DTSA (Count II) and ITSA (Count V)

Plaintiff brings two claims for misappropriation of trade secrets: Count II

under the DTSA and Count V under the ITSA. Compl. ¶¶ 48–56, 70–78. To state a DTSA claim, the plaintiff must plausibly allege facts "sufficient to provide notice that the relevant information constitutes a trade secret, and . . . must sufficiently allege that the defendant has misappropriated the trade secret within the meaning of § 1836(b)(1)." *Packaging Corp. of Am., Inc., v. Croner*, 419 F. Supp. 3d 1059, 1065–66 (N.D. Ill. 2020) (cleaned up).[4] Under DTSA, misappropriation "means the acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 558, 573 (N.D. Ill. 2019) (citing 18 U.S.C. § 1839(5)). "[T]he term 'improper' means (A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6).

Similar to the DTSA, to state a claim for violation of the ITSA "a plaintiff must allege: (1) that the information at issue was a trade secret; (2) that it was misappropriated; and (3) that it was used in the defendants' business." *Fire 'Em Up, Inc. v. Technocarb Equip. (2004) Ltd.*, 799 F. Supp. 2d 846, 849 (N.D. Ill. 2011). The ITSA defines "misappropriation," "improper means," and "trade secrets" similarly to the DTSA. *Compare* 765 ILCS 1065/2(a), (b), (d), *with* 18 U.S.C. § 1839(3), (5), (6).

Since "the pertinent definitions of the [DTSA and ITSA] overlap," courts often

---

[4]This Order uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

evaluate these claims together. *PrimeSource Bldg. Prods. v. Felten*, 2017 WL 11500971, at *6, n.5 (N.D. Ill. July 6, 2017). *See also Molon Motor & Coil Corp. v. Nidec Motor Corp.*, 2017 WL 1954531, at *3 (N.D. Ill. May 11, 2017) (differences in definitions between DTSA and ITSA are "immaterial" for purposes of resolving a motion to dismiss). Put simply, "for both its DTSA and ITSA claims, [Plaintiff] must allege that (1) there are trade secrets (2) that Defendants misappropriated." *Aon PLC v. Infinite Equity, Inc.*, 2021 WL 4034068, at *12 (N.D. Ill. Sept. 3, 2021).

### A. Trade Secrets

Defendants first argue that Plaintiff fails to sufficiently allege the first element: the existence of trade secrets. Mot. Dismiss at 7.

The DTSA defines a trade secret as:

(3)     All forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

(A)     the owner thereof has taken reasonable measures to keep such information secret; and

(B)     the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3). The definition of trade secrets in the ITSA "is materially identical." *Life Spine, Inc., v. Aegis Spine, Inc.*, 8 F.4th 531, 540 (7th Cir. 2021). and imposes the same requirements. *See* 765 ILCS 1065/2(d).

Starting with Plaintiff's customer database, Defendants assert that it consists of readily ascertainable information and thus cannot qualify as a trade secret because Plaintiff obtained its customer identities from a public DOT database. Mot. Dismiss at 7–8. Further, Defendants argue that Plaintiff's allegation related to creating its *own* customer database by supplementing the DOT's public information with certain non-public information is insufficient, as this allegation "does not claim that any of that information is not publicly available on the internet." *Id*. at 8.

Plaintiff disagrees, stating that it "specifically alleges that the information contained in [Plaintiff's] customer database and systems does not appear in any directory or publicly available source, nor is it commonly known or easily discoverable or ascertainable by [Plaintiff's] competitors." R. 12, Resp. at 7–8 (identifying this information as "current email addresses and point of contact for the safety department for all registered DOT motor carriers, testable phone numbers (SMS ready numbers), names of parties responsible for safety compliance, and permission to be contacted by Plaintiff"). These allegations, from Plaintiff's perspective, sufficiently state that the customer database contains information that is not readily ascertainable. The Court agrees.

Courts in this district regularly find that customer databases alleged to "go beyond mere public customer identities" may qualify as trade secrets under the DTSA and ITSA. *Mickey's Linen v. Fischer*, 2017 WL 3970593, at *9 (N.D. Ill. Sept. 8, 2017); *see also Allied Waste Servs. of N. Am., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1112 (N.D. Ill. 2016) ("Trade secrets include customer lists that are not readily ascertainable,

10

pricing, distribution, and marketing plans, and sales data and market analysis information."); *Mintel Int'l Group, Ltd. v. Neergheen*, 2010 WL 145786, at *11 (N.D. Ill. Jan 12, 2010) ("prospective clients (and their addresses)" were trade secrets; *APC Filtration, Inc. v. Becker*, 646 F. Supp. 2d 1000, 1010 (N.D. Ill. 2009) (holding that the names and address of contact persons of customers was a trade secret with "obvious and well recognized" value). Defendants cite no authority for the proposition that Plaintiff is required to allege that the information in its customer database "is not publicly available on the internet." Mot. Dismiss at 8. True, Plaintiff derived the identities of its customers from a public DOT database, but Plaintiff alleges that it used those identities to create its own database and, crucially, supplemented that database with a host of "information that was not readily available." Compl. ¶ 14. That is all that is required at this stage of the litigation. Accordingly, the Court finds that Plaintiff's customer database contains information that is not readily ascertainable and declines to dismiss Counts II and V on this basis.

Turning to Plaintiff's templates and payment system, Defendants argue that Plaintiff fails to allege they contain information that is not readily ascertainable. Mot. Dismiss at 9. Not only that, but Plaintiff's descriptions of its templates and payment system, according to Defendants, fail to "adequately identify the purported misappropriated trade secret," as Plaintiff improperly points only to "generalized categories of information or business tools [to which] Slesinski had access." R. 22, Reply at 4.

Plaintiff rejects the notion that it is required to allege its templates and

payment systems contain information not readily ascertainable. Resp. at 8. From Plaintiff's perspective, it need only describe "the information and the efforts to maintain its confidentiality . . . in general terms." *Id*. at 7. And because Plaintiff identifies its trade secrets and describes their purpose, Plaintiff asserts that it has sufficiently provided Defendants "with notice of the confidential information it claims are trade secrets." *Id*. The Court agrees.

"Courts are in general agreement that trade secrets need not be disclosed in detail in a complaint alleging misappropriation for the simple reason that such a requirement would result in public disclosure of the purported trade secrets." *AutoMed Techs., Inc. v. Eller*, 160 F. Supp. 2d 915, 921 (N.D. Ill. 2001); *see also Fire 'Em Up, Inc.*, 799 F. Supp. 2d at 849 ("alleged trade secrets need not be disclosed in detail in a complaint to survive a motion to dismiss"). Accordingly, "[c]ourts in this district . . . have concluded trade secret allegations to be adequate in instances where the information and the efforts to maintain its confidentiality are described in general terms." *Mission Measurement Corp. v. Blackbaud, Inc.*, 216 F. Supp. 3d 915, 920 (N.D. Ill. 2016) (cleaned up); *see also GoHealth, LLC v. Simpson*, 2013 WL 6183024, at *12 (N.D. Ill. Nov. 26, 2013) (identification of trade secret as processes, systems, and technology allowing a call center to respond quickly adequate to state a claim); *Papa John's Int'l v. Rezko*, 446 F.Supp.2d 801, 812 (N.D. Ill.2006) (claim survived motion to dismiss even though it was "unclear which trade secrets of the 'Papa John's System' were misappropriated"). "In this context, courts only dismiss a claim for lack of specificity on the pleadings in the most extreme cases." *Mission Measurement Corp.*,

12

216 F. Supp. 3d at 920 (cleaned up); *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003) ("the question of whether certain information constitutes a trade secret ordinarily is best resolved by a fact finder after full presentation of evidence from each side") (cleaned up).

Contrary to Defendants' contentions, Plaintiff does not point only to "generalized categories of information or business tools [to which] Slesinski had access." Reply at 4. Rather, Plaintiff alleges that its templates consist of "simplified, user-friendly forms" that "inform[ed] clients of regulations that they are required to comply with," "educat[ed] motor carriers about applicable DOT and FMSCA regulations," and confirmed "filing, status, and error reporting." Compl. ¶ 16. Additionally, Plaintiff alleges that its payment consists of "online applications" that "collect[ed] data," "assess[ed] client data to alert users to additional compliance requirements," and sent users "automated confirmation alerts, receipts, and reminders based on company information and the need to comply with specific regulations." *Id.* ¶ 17. In short, the Court finds that Plaintiff has adequately described its templates and payment system and declines to dismiss Counts II and V on this basis.

The last arrow in Defendants' quiver is the assertion that Counts II and V must be dismissed because Plaintiff "did not adequately protect its information from disclosure." Mot. Dismiss at 9. Citing no case law, Defendants base this argument on the sole fact that Plaintiff "failed to have Slesinski sign [its] Information Security and Trade Secrets Agreement until more than four months after employing him." *Id.* In

response, Plaintiff argues, among other things, that Defendants' contention ignores several allegations demonstrating that "additional reasonable measures of protection were taken." Resp. at 10.

"Under both the DTA or ITSA, a plaintiff must take reasonable efforts to ensure the secrecy of its trade secrets." *Sievert Elec. Serv. & Sales Co. v. Storako*, 2024 WL 4346789, at *10 (N.D. Ill. Sept. 30, 20204). Whether the measures taken by a trade secret owner are sufficient to satisfy ITSA's reasonableness standard "is a fact-specific inquiry that depends on the particularities of each plaintiff's business." *Id.* "At the pleading stage, a plaintiff is required only to allege the measures it took in general terms." *Id.*

Here, Plaintiff adequately alleges the measures that it took to protect its trade secrets. Plaintiff alleges that it maintained its alleged trade secrets "in protected computer files that are accessible only by use of secret passwords and two-factor authentication procedures, as well as by utilizing different levels of permission to access its files and folders." Compl. ¶ 21. Further, Plaintiff alleges that:

> Slesinski received extensive training when he began his employment with Plaintiff, which included instruction related to the avoidance of self-dealing and breaches of loyalty, including the misuse of confidential information. During this training, Slesinski agreed to abide by the policies, procedures and controls Plaintiff had in place to protect its proprietary information and trade secrets and to avoid activities that placed Plaintiff's interests in conflict with his own personal interests or that of third parties.

*Id.* ¶ 32. In addition, Plaintiff alleges that it required Slesinski to sign the "Information Security and Trade Secrets Agreement." Plaintiff's failure to have Slesinski sign the Information Security and Trade Secrets Agreement for four

14

months, alone, does not warrant dismissal of these counts. Plaintiff is "not required to allege that it took every viable or prudent measure" to secure its trade secrets. *Storako*, 2024 WL 4346789, at *12. True, Plaintiff will need to demonstrate the reasonableness of the measures it took at a later stage of the litigation, but not today. *Id*. In sum, the Court finds Plaintiff has sufficiently alleged that it took reasonable measures to maintain the confidentiality of its alleged trade secrets. *See Segerdahl Corp. v. Ferruzza*, 2019 WL 77426, at *3 (N.D. Ill. Jan. 2, 2019) (DTSA and ITSA claims survived motion to dismiss where plaintiff "conduct[ed] annual security training for employees to maintain secrecy, control[ed] access to the facilities, ke[pt] the information on password protected computers, and disclos[ed] the information on a need to know basis."); *Traffic Tech, Inc. v. Kreiter*, 2015 WL 9259544, at *11 (N.D. Ill. Dec. 18, 2015) (plaintiff adequately alleged reasonable measures by stating it "implement[ed] confidentiality policies" and "limit[ed] access to [confidential] information to key employees").

All in all, the Court finds that Plaintiff has sufficiently alleged that its customer database, templates, and payment system qualify as trade secrets.

## B. Misappropriation

Defendants next argue that a "plaintiff alleging misappropriation of trade secrets must plead that the defendant *used* the secret in its business, and that such use actually harmed the plaintiff." Mot. at 10 (citing *In re Adegoke*, 632 B.R. 154, 165 n.9 (N.D. Ill. 2021)). And from Defendants' perspective, Plaintiff fails to allege that Defendants *used* its trade secrets and thus fails to state a claim.

15

Plaintiff counters that Defendants present an incomplete statement of the law. "Under the DTSA and ITSA, a plaintiff can show misappropriation in *three* ways: by showing unauthorized acquisition, disclosure, or use of a trade secret." *Symbria, Inc. v. Callen*, 2022 WL 60530, at *12 (N.D. Ill. Jan. 6, 2022) (citing *J.S.T. Corp. v. Foxconn Interconnect Tech. Ltd.*, 965 F.3d 571, 576 (7th Cir. 2020) (emphasis added). Thus, Plaintiff argues, it sufficiently pled misappropriation by alleging that Slesinski "wrongfully acquired [Plaintiff's] trade secrets through improper means when he was caught viewing certain protected information he was unauthorized to access while at work, and when he emailed confidential trade secret information to his personal email account from his work computer." Resp. at 11.

The Court agrees and finds that Plaintiff has sufficiently pled misappropriation through unauthorized acquisition. *See Symbria, Inc*, 2022 WL 60530, at *12 ("Alleging the transmission of trade secrets from a work email account to a personal email account in violation of company policy and without authorization sufficiently pleads a theory of improper acquisition."); *TF Glob. Markets (Aust) Ltd. v. Sorenson*, 2023 WL 2138999, at *5 (N.D. Ill. Feb. 17, 2023) (misappropriation sufficiently alleged where defendant "retained without authorization numerous sensitive emails"); *Insight Glob., LLC v. Borchardt*, 2018 WL 2267810, at *3–4 (N.D. Ill. May 17, 2018) (allegations that defendant took "immediate employment with a competitor doing the same type of work" coupled with "evidence that [defendant] took materials from the company prior to leaving," were "sufficient to infer the possibility that [defendant] misappropriated trade secrets"); *also Aon PLC*, 2021 WL 4034068,

at *12 (complaint sufficiently pled misappropriation where an employee emailed trade secrets to his personal email account in violation of company policy).

## C. Damages

Last, Defendants argue that Plaintiff's allegations regarding damages are insufficient. Mot. Dismiss at 10 ("While Plaintiff claims that it has sustained substantial lost revenue and profits, Plaintiff cannot identify a single client it has lost due to Defendants' conduct. Those speculative allegations are insufficient under *Iqbal*."). Plaintiff, on the other hand, maintains that it need only allege "that it has been irreparably damaged by a defendant's willful and wanton conduct, including loss of profits and business, such allegations are sufficient to survive at the pleading stage." Resp. at 12. Notably, Defendants cite no authority in support of their argument, while Plaintiff's cite several cases.

The Court finds that Plaintiff has the better of the argument. Plaintiff alleges it "has sustained substantial lost revenue and profits and irreparable harm and damage, including the loss of valuable confidential information, the loss of goodwill and the ability to market and sell its services to the trucking industry." Resp. at 12 (citing Compl. ¶¶ 39-40, 54, 56, 76, 78). This is sufficient to plead damages. *See Traffic Tech*, 2015 WL 9259544, at *11 (plaintiff's allegation that it ""has been irreparably damaged by Defendants' willful and wanton conduct, including loss of profits and business" was "sufficient to survive the pleading stage.").

All in all, the Court finds that Plaintiff has sufficiently pled violations of the DTSA and ITSA and denies Defendant's motion to dismiss Counts II and V.

## II.    Violation of the CFAA (Count III)

In Count III Plaintiff alleges that Slesinski violated Section 1030(a)(4) of the CFAA by unlawfully accessing Plaintiff's confidential files and uploading them to his personal email account. Compl. ¶¶ 57–63. The CFAA, in pertinent part, provides that "any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator." 18 U.S.C. § 1030(g). Pursuant to the CFAA, "a plaintiff must allege (1) damage or loss; (2) caused by (3) a violation of one of the substantive provisions set forth in § 1030(a), and (4) conduct involving one of the factors of harm set forth in § 1030(c)(4)(A)(i)(I)-(VI)." *Segerdahl*, 2019 WL 77426, at *4 (cleaned up). For violations of § 1030(a)(4), a plaintiff must allege either damage *or* loss, but not both. *Id.* (citing 18 U.S.C. § 1030(a)(2)(C), (a)(4)).

The parties' dispute centers on whether Plaintiff has adequately alleged the element of "loss." The CFAA defines "loss" to mean "any reasonable costs to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). Defendants argue that Plaintiff fails to plausibly allege "loss," insisting that allegations of "loss" must relate to the impairment or disruption of a plaintiff's computer system. Mot. Dismiss at 10–11. Not so, counters Plaintiff, pointing out that it has alleged that "as a result of Slesinski's unauthorized access to [Plaintiff's] protected computer files and network, [Plaintiff] has spent in excess of $5,000.00 in

investigating his wrongful conduct." Compl. ¶ 63.

As Defendant acknowledges, there is a split among courts in this district as to what a plaintiff must allege to adequately plead "loss." Relying on *Inmar, Inc. v. Vargas*, 2018 WL 6716701 (N.D. Ill. 2018), Defendants urge this Court to side with those courts that have found that "loss" under the CFAA must relate to the impairment or disruption of a plaintiff's computer system. Plaintiff, on the other hand, relying on *Pascal Pour Elle, Ltd. v. Jin*, 75 F. Supp. 3d 782 (N.D. Ill. 2014), invites the Court to side with those courts that have found that allegations of "loss" do *not* require such an impairment or disruption. The Court finds that Plaintiff has the better of the argument.

In *Inmar*, the plaintiffs claimed "that they suffered damages in excess of $5,000 from the cost of responding to [d]efendants' unlawful actions and conducting a damage assessment." *Inmar*, 2018 WL 6716701, *10. The defendants argued "that loss requires [p]laintiffs to allege that the costs are associated with responding to an interruption of service or that an impairment of data occurred." *Id*. Referring to the intent of Congress, the court agreed with the defendants, stating:

> When enacting the CFAA, Congress was concerned with . . . attacks by virus and worm writers, on the one hand, which come mainly from the outside, and attacks by disgruntled employees who decide to trash the employer's data on the way out (or threaten to do so in order to extort payments), on the other. Accordingly, to permit a plaintiff to state a CFAA claim by simply alleging costs incurred in responding to an alleged offense or conducting a damage assessment without alleging that the offense caused damage would impermissibly broaden the applicability of the CFAA to provide seemingly unfettered access to federal courts to adjudicate state law issues incidental to computer use.

*Id*. (cleaned up).

19

In *Pascal*, like the present case, the plaintiff alleged "that it incurred a loss of over $5000 in investigation and security assessment costs associated with [the defendant's] intrusion." In finding this sufficient to allege "loss," the court stated:

> Ultimately, the Court is more persuaded by the plain language of the statute which defines loss as "*any reasonable cost* to any victim, *including the cost of responding to an offense.*" § 1030(e)(11). (emphasis added). The statute clearly states that loss includes any reasonable cost to the victim, and then provides examples of costs that could be considered reasonable under the statute. However, the definition, by its use of the word "including," does not state that the list is exhaustive. In addition, the Court finds that the "cost of responding to an offense" includes the costs associated with conducting investigation and security assessments in response to a suspected violation of the CFAA.

*Pascal*, 75 F. Supp. 3d at 791.

"As with any question of statutory interpretation, our inquiry "begins with the text." *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 800 (7th Cir. 2020). The Court finds the reasoning of *Pascal* persuasive. The CFAA's definition of "loss" is quite broad: "*any reasonable cost* to any victim, *including the cost of responding to an offense.*" 18 U.S.C. § 1030(e)(11). The "cost of responding to an offense" can certainly encompass money spent in relation to investigating a suspected CFAA violation. Therefore, the Court finds that Plaintiff's allegation that it spent $5,000 investigating Slesinski's unauthorized access to its confidential information is sufficient to allege "loss" under the CFAA. *ExactLogix, Inc. v. JobProgress, LLC*, 508 F. Supp. 3d 254, 268 (N.D. Ill. 2020) (costs result from responding to a potential CFAA violation offense or conducting a damage assessment sufficient to allege loss); *Chamberlain Grp., Inc. v. Techtronic Indus. N. Am., Inc.*, 2017 WL 4269005, at *7 (N.D. Ill. Sept. 26, 2017) (allegations of loss related to investigation of defendant's "unauthorized

access to and acquisition of" plaintiff's confidential information "is clearly contemplated" by the CFAA, "regardless of whether service was interrupted."); *Lane v. Brocq*, 2016 WL 1271051, at *11 (N.D. Ill. Mar. 28, 2016) (losses related to investigation sufficient "[g]iven the broad meaning of loss under the statute"); *Farmers Ins. Exch. v. Auto Club Grp.*, 823 F. Supp. 2d 847, 854 (N.D. Ill. 2011) (allegation of loss related to investigating defendant's "unauthorized access to and acquisition of" plaintiff's confidential information was sufficient "[b]ased on the plain language of the CFAA"); *Motorola, Inc. v. Lemko Corp.,* 609 F.Supp.2d 760, 768 (N.D. Ill. Feb. 11, 2009) (allegations of loss "related to damage and security assessments . . . are sufficient to allege loss for purposes of the CFAA"); *TEKsystems, Inc. v. Modis, Inc.,* 2008 WL 5155720, at *5 (N.D. Ill. Dec. 5, 2008) (allegations of loss related to a "computer forensic investigation into [defendant's] conduct" sufficient under CFAA); *Sam's Wines & Liquors, Inc. v. Hartig,* 2008 WL 4394962, at *4 (N.D. Ill. Sept. 24, 2008) (plaintiff "adequately pleaded loss under the CFAA" by alleging costs of at least $5,000 "responding to [defendant's] conduct and conducting damage assessments"). Defendants' motion to dismiss Count III is denied.

## III.    Violations of the SCA (Count IV)

In Count IV, Plaintiff alleges that Slesinski violated the SCA by unlawfully accessing Plaintiff's "email server and computing devices for purposes of obtaining [Plaintiff's] confidential proprietary customer information and secret API Key." Compl. ¶ 68. Defendants argue that Plaintiff has not pled actual damages or that Defendants profited from the alleged violation and therefore fails to state a claim.

21

Mot. Dismiss. at 13. Plaintiff, on the other hand, argue that it need not plead actual damages or Slesinski's profits to adequately state a claim under the SCA.

The SCA provides in pertinent part that "[t]he court may assess as damages in a civil action under this section the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation, but in no case shall a person entitled to recover receive less than the sum of $1,000." 18 U.S.C. § 2707(c). Further, the SCA provides that if "the violation is willful or intentional, the court may assess punitive damages. In the case of a successful action to enforce liability under this section, the court may assess the costs of the action, together with reasonable attorney fees determined by the court." *Id.*

Although Defendants acknowledge that "several courts in this District previously found that the SCA does not require a showing of actual damages," they urge this Court to adopt the holding of *Vista Marketing, LLC v. Burkett*, 812 F.3d 954, 966 (11th Cir. 2016) an Eleventh Circuit case, which held that "only those persons who have proved actual damages suffered or profits received by the defendant" can state a claim under the SCA. *Id.* Plaintiffs disagree, arguing that Defendants' "reliance on *Vista Marketing* is improper and irrelevant," and that, in light of in-district cases holding that a plaintiff need not allege actual damages under the SCA, it has indeed pled an SCA claim. Resp. at 14.

The Court, however, need not reach this issue, as Defendants fail to acknowledge that a plaintiff is still entitled to "punitive damages, attorney's fees, or costs for an SCA violation," regardless of whether actual damages are pled. *Maremont*

22

*v. Susan Fredman Design Grp., Ltd.*, 2014 WL 812401, at *7 (N.D. Ill. Mar. 3, 2014). (citing *Van Alstyne v. Elec. Scriptorium, Ltd.*, 560 F.3d 199, 209 (4th Cir. 2009) ("Section 2707(c) states, '[i]f the violation [of the SCA] is willful or intentional, the court may assess punitive damages.' This sentence lacks the limiting language associated with an award of actual damages and statutory damages, with no references to persons 'entitled to recover.'") (cleaned up); *see also Joseph v. Carnes*, 566 F. App'x 530, 534 (7th Cir. 2014) ("The SCA provides that a successful plaintiff may recover 'actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation' *as well as* 'punitive damages'") (emphasis added). Indeed, even *Vista Marketing* provides that the SCA "serve[s] as a deterrent to would-be violators even when they think their violations will inflict no actual damages, *and it permits victims to recover in an appropriate case even when they can prove no actual damages*." *Vista Marketing*, 812 F.3d at 973 (emphasis added).

In its SCA claim, Plaintiff has requested "punitive damages for [Slesinski's] willful misconduct and reasonable attorneys' fees." Compl. ¶ 69. Plaintiff has also adequately pled that Slesinski acted willfully in violating the SCA. *See* Compl. ¶ 68. Accordingly, Defendants' motion to dismiss Count IV is denied. *See Sysco Corp. v. Katz*, 2013 WL 5519411, at *4 (N.D. Ill. Oct. 3, 2013) ("because Plaintiffs seek punitive damages and attorney's fees, which can be recovered absent proving actual damages, the SCA count survives"); *Chadha v. Chopra,* 2012 WL 6044701, at *3 (N.D. Ill. Dec. 5, 2012) (because plaintiff sought both attorney's fees and punitive damages, the SCA claim survived a motion to dismiss arguing failure to allege actual damages).

23

IV.    **State Law Claims**

Plaintiff brings claims for breach of fiduciary duty (Count I), tortious interference with business relations (Count VII), aiding and abetting breach of fiduciary duty (Count VIII), and accounting (Count IX). Defendants argue that these claims are preempted by the ITSA. Mot. Dismiss at 14–16. Alternatively, Defendants contend that Plaintiff fails to plausibly allege these claims. The Court addresses each claim in turn.

A.    **Breach of Fiduciary Duty Claims (Counts I and VIII).**

In Count I, Plaintiff asserts that Slesinski breached his fiduciary duty to Plaintiff, and in Count VIII, Plaintiff asserts that Dobosz aided and abetted these breaches.

1.    **Preemption**

Defendants argue the ITSA preempts both claims, as they solely arise from Slesinski's misappropriation of trade secrets. Mot. Dismiss at 14–15. The Court disagrees.

The ITSA is "intended to displace conflicting tort, restitutionary, unfair competition and other laws of Illinois by providing civil remedies for misappropriation of a trade secret." *Spitz. v. Proven Winners N. Am., LLC*, 759 F.3d 724, 733 (7th Cir. 2014) (quoting 765 ILCS 1065/8). "Illinois courts have read the preemptive language in the ITSA to cover claims that are essentially claims of trade secret misappropriation, even when the alleged trade secret does not fall within the Act's definition." *Id.* "However, ITSA does not preempt . . . other civil remedies that are not

based upon misappropriation of a trade secret." *Am. Ctr. for Excellence in Surgical Assisting Inc. v. Cmty. Coll. Dist. 502,* 190 F. Supp. 3d 812, 822 (N.D. Ill. 2016). Put differently, courts, in deciding whether the ITSA's preemption applies, ask whether a plaintiff's claim "would stand regardless of whether trade secrets were at issue." *Gen. Elec. Co. v. Uptake Techs, Inc.*, 394 F.Supp. 3d 815, 835 (N.D. Ill. 2019). Generally, "employees may plan, form, and outfit a competing corporation while still working for the employer, but they may not commence competition." *Alpha Sch. Bus Co. v. Wagner,* 910 N.E.2d 1134, 1149 (Ill. App. Ct. 2009).

Here, Plaintiff alleges that Slesinski, with Dobosz's knowledge: (1) solicited Plaintiff's current and potential clients; (2) usurped Plaintiff's business opportunities; (3) forwarded over 100 emails to his personal email account, many of which contained confidential business information, and (4) formed and operated a business that was directly competitive with Plaintiff while still employed by Plaintiff. Compl. ¶¶ 38, 40, 43–44, 46–47, 93). These allegations sufficiently support the inference that Defendants began competing with Plaintiff, through NCC, before Slesinski ended his employment with Plaintiff. Put another way, Plaintiff's claim "would stand regardless of whether trade secrets were at issue. See, *Bankers Life & Cas. Co. v. Miller*, 2015 WL 515965, at*8 (N.D. Ill. Feb 6, 2015) (breach of fiduciary duty not preempted by ITSA where complaint alleged defendant used improperly acquired information once he began competing); *Hecny Transportation, Inc. v. Chu*, 403 F.3d 402 (7th Cir. 2005). As such, the ITSA does not preempt Plaintiff's claim for breach of fiduciary duty. *Id.*

### 2. Failure to State a Claim

Alternatively, Defendants argue that Plaintiff fails to state a claim for breach of fiduciary duty because "Plaintiff pleads only the self-serving accusation that Defendants used Plaintiff's information to compete, without any supporting facts." Mot. Dismiss at 17.

To state a claim for breach of fiduciary duty, Plaintiff must allege facts that show: (1) a fiduciary relationship existed, (2) breach of that duty, and (3) that breach proximately caused the injury of which the plaintiff complains. *Lawlor v. North American Corp. of Illinois*, 983 N.E.2d 414, 433 (Ill. 2012). "This fiduciary duty consists of three separate duties: due care, loyalty, and good faith." *Griffin v. Asset Mgmt., LLC v. Clark*, 2024 WL 1328828, at *7 (N.D. Ill. Mar. 28, 2024).

Here, when taking all well-pled allegations as true and making all reasonable inferences in Plaintiff's favor, the Court finds that Plaintiff has sufficiently alleged that Slesinski, with the help of Dobosz, competed with Plaintiff while he still owed a Plaintiff a duty of loyalty. Compl. ¶¶ 43–44, 93. Thus, the Court finds that Plaintiff has sufficiently alleged Slesinski breached his fiduciary duty, and, by proxy, that Plaintiff has sufficiently alleged that Dobosz aided and abetted Slesinski in doing so.

Accordingly, the Court denies Defendants' motion to dismiss Counts I and VIII.

### B. Tortious Interference with Business Relations (Count VII)

In Count VII, Plaintiff alleges that Defendants tortiously interfered with its business relations by "induc[ing] hundreds of its clients to sever their contractual relationships and discontinue[] doing business with" Plaintiff. Compl. ¶ 86.

### 1. Preemption

Defendants insist that the ITSA preempts this claim, as its "core allegation" is that "Defendants acted improperly and intentionally using [Plaintiff's] confidential, trade secret information." Mot. Dismiss at 15 (quoting Compl. ¶ 87). Plaintiff retorts that Defendants' act of soliciting Plaintiff's customers and inducing them to sever their relationships with Plaintiff is independent of misappropriation and therefore survives preemption. Resp. at 16. The Court agrees with Plaintiff.

The ITSA preempts a tortious interference claim if the claim is "wholly dependent on the existence of the allegedly misappropriated information." *Arjo, Inc. v. Handicare USA, Inc.*, 2018 WL 5298527, at *8 (N.D. Ill. Oct. 25, 2018). Here, Plaintiff's claim is not wholly dependent upon such information. Rather, it is dependent upon the Defendants' act of inducing Plaintiff's clients to sever their contracts and discontinue doing business with Plaintiff. Accordingly, the Court finds that the ITSA does not preempt Plaintiff's tortious interference claim.

### 2. Failure to State a Claim

Defendants next argue that Plaintiff fails to allege the necessary elements of its tortious interference claim.

To state a claim for tortious interference with business relations, a plaintiff must allege: "(1) the plaintiff had a reasonable expectancy of a valid business relationship; (2) the defendant knew about the expectancy; (3) the defendant intentionally interfered with the expectancy and prevented it from ripening into a valid business relationship; and (4) the intentional interference injured the plaintiff."

*Meyer*, 2018 WL 1427130, at *2. A plaintiff "must also allege that the defendant directed his behavior toward a third party." *Id*.

Defendants maintain that Plaintiff "must allege some action by the defendant directed at the third party with whom the plaintiff has the expectancy." Mot. Dismiss at 18 (citing *Meyer Technology Solutions, LLC v. Kaegem Corp.*, 2018 WL 1427130, at *2 (N.D. Ill. 2018)). And since Plaintiff "fails to identify a single client who, due to Defendants' conduct, decided not to do business with Plaintiff," its claim fails. *Id*.

Plaintiff rejects Defendants' interpretation of the pleading standard for a tortious interference claim, stating that *Meyer* does not require a plaintiff to specifically name any third party. Resp. at 18; *see also* Resp. at 18–19 (citing *Cook v. Winfrey*, 141 F.3d 322, 328 (7th Cir. 1998) ("The Federal Rules do not require that [a plaintiff's] complaint allege the specific third party or class of third parties with whom he claims to have had a valid business expectancy.").

Plaintiff is correct that Defendants overstate the holding of *Meyer*, as it did not hold that a plaintiff must specifically identify any clients or customers that a defendant has allegedly poached or attempted to poach. Rather, the (counter) plaintiff's claim failed in *Meyer* because it "never allege[d] that [the counter defendant] directed any conduct toward any of [its] customers." *Meyer*, 2018 WL 1427130, at *2. *Meyer* requires no further specificity, and Defendants do not point to any language to the contrary.

Here, Plaintiff sufficiently pleads all the elements of tortious interference. Plaintiff alleges that it "had the expectancy of continued business relationships with

28

its clients," that Defendants purposefully targeted clients with whom Plaintiff had contracts and induced them to sever those contracts, and that, as a result, Plaintiff "has suffered and will continue to suffer financial injury in an amount to be proven at trial." Compl. ¶¶ 85–88. Nothing further is required.

Accordingly, the Court denies Defendants' motion to dismiss Count VII.

## C. Accounting (Count IX)

In Count IX, Plaintiff alleges that as "a consequence of Defendants' improper conduct," "[d]etailed discovery, including expert forensic computer and accounting work, will be required to ascertain the actions taken by Defendants and the financial and other benefits that have inured to them as a result of their wrongful actions and accordingly Hoffenmer has no adequate remedy at law." Compl. ¶¶ 96–97.

### 1. Preemption

Like the previous claims, Defendants argue that "Plaintiff's claim for an accounting in Count IX is based upon Defendants' 'improper conduct' in misappropriating trade secrets" and therefore must be preempted. Mot. Dismiss at 16.

The Court disagrees that Plaintiff's claim for an accounting is preempted. Plaintiff alleges that it requires an accounting due to Defendants' "improper conduct." Compl. ¶ 96. As the Court explained in relation to Plaintiff's breach of fiduciary duty claim and tortious interference claim, the allegations regarding Defendants' improper conduct goes beyond the misappropriation of trade secrets. Accordingly, the Court finds that the ITSA does not preempt Plaintiff's accounting claim.

29

### 2. Failure to State a Claim

"To state a claim for accounting, [a plaintiff] must allege both the absence of an adequate remedy at law as well as at least one of the following: (1) a breach of a fiduciary relationship, (2) a need for discovery, (3) fraud, or (4) the existence of mutual accounts which are of a complex nature." *Promier Prods., Inc. v. Orion Cap., LLC*, 2022 WL 2116663, at *3 (N.D. Ill. June 13, 2022) (citing *Kempner Mobile Elecs., Inc. v. Southwestern Bell Mobile Sys.*, 428 F.3d 706, 715 (7th Cir. 2005)).

Defendants do not argue that Plaintiff fails to allege the absence of an adequate remedy at law. Therefore, the Court does not address the sufficiency of that allegation. *Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 721 (7th Cir. 2008) (it "is not the court's responsibility to research the law and construct the parties' arguments for them). Instead, Defendants assert that Plaintiff cannot make out a claim for accounting because it has not alleged a breach of fiduciary duty or that it lost any client to Defendants. Mot. Dismiss at 19. The Court, however, has already dispatched these arguments. Since these are the only challenge to Plaintiff's accounting claim, the motion to dismiss Count IX is denied.

## V. Defendants' Request to Strike Exhibit A to Plaintiff's Response

In their Reply, Defendants request to strike Exhibit A to Plaintiff's response. The Court did not consider Plaintiff's Exhibit A and thus need not address this issue.

## Conclusion

For the foregoing reasons, the Court denies Defendants' Motion to Dismiss.

R. 17.

Dated: June 13, 2025

United States District Judge
Franklin U. Valderrama